Court is now in session. The next case on our docket is El Paso County v. Trump. Mr. Byron. Thank you, Chief Judge Owen. May it please the court. I'm Thomas Byron from the Department of Justice here on behalf of the federal government defendants who are appellants and cross appellees in this court. The district court in this case entered a nationwide injunction prohibiting the construction funds authorized by Congress and appropriated to D.O.D. for border barrier construction projects that are nowhere near El Paso. That injunction was improper and should be vacated, both because the plaintiffs here lack standing to bring this case and because the district court misunderstood the governing statutes. First, Your Honor, both plaintiffs, El Paso County and the BNHR, based their standing not on anything having to do with any construction project under Section 2808, the military construction statute, but instead on a disagreement with the president's message, the policy the president announced in the proclamation declaring an emergency. Their declarations, in fact, were filed before the Department of Defense had any particular 2808 construction project and made no effort to base any asserted injury on the effects of any construction under Section 2808. That is insufficient, and the bases, the asserted bases for standing do not withstand scrutiny. This court, in cases such as Kyle, OCA, Acorn, and Scott, undertook very careful scrutiny of the plaintiffs' asserted injuries and made sure that speculative and conclusory assertions would not form the basis for standing to challenge government action. It should do so here as well. El Paso asserts an injury first, and the district court concluded that El Paso County itself was the object of the president's proclamation declaring a national emergency. That misreads the president's proclamation. Nowhere in that proclamation is there any reference to El Paso County. It does not single out the community in any way. The idea that El Paso County is the object of the proclamation indeed is unsupported by the district court's opinion. It undertakes no textual analysis and finds no other basis for determining that El Paso County is the object of the proclamation. That cannot be the basis for standing here. El Paso County also asserts that as an indirect result of what it claims will be the actions of third parties, tourists, and businesses, that its tax revenues will indirectly be reduced as a consequence of the federal government's policy at the border. That has been determined in multiple cases by many circuits to be insufficient to support a claim of injury by a state or local government in a suit against the federal government. In cases such as Iowa in the Eighth Circuit, Pennsylvania in the DC Circuit, and Wyoming in the Tenth Circuit, every court of appeals to address this question has found that those kinds of general assertions of indirect reductions in tax revenues cannot suffice to support standing by a local or state government. Contrast that with the Supreme Court's decision in Wyoming against Oklahoma, where the court recognized those court of appeals decisions and distinguished them because it determined that a specific excise tax on coal that had actually been reduced demonstrably by a policy, by a statute in Oklahoma reducing purchases of Wyoming coal did support standing in an original action in that case. There's no such claim here. And El Paso County cannot base its indirect claims of economic harm as a basis for standing to challenge the 2808 construction at issue here. BNHR similarly invokes only speculative and conclusory assertions in support of its standing to challenge the construction at issue here. The only declaration that it submitted from its founder and leader says nothing about any 2808 construction project and indeed says nothing about any construction at all. Instead, it is based entirely on asserted injuries that the declarant claims result from the policies of the federal government at the border generally, immigration and law enforcement policies principally. So the BNHR claims that it has expended additional funds that it otherwise would not have had to spend as a consequence of what it says are increased abuses by federal law enforcement or immigration officers. But those are not traceable to or redressed by anything having to do with border wall construction under Section 2808's authorization for military construction by DOT. For that reason, both plaintiffs lack standing and the district court should have dismissed the case on that basis and certainly should not have entered the the construction by the Department of Defense using its independent statutory authority and funds appropriated for military construction. Is it correct that once you're at the permanent injunction stage, then there needs to be proof of standing rather than merely allegations of standing? Yes, Judge Haynes, that's absolutely correct. And we think that the declarations that were submitted by the plaintiffs here are construction projects or identifying injury traceable to any particular 2808 construction. That is itself a failure of the jurisdiction of the district court and a basis to vacate the injunction. Turning to the merits, the district court misunderstood both the Consolidated Appropriations Act and its effect on the independent statutory authority that Congress has granted to the Department of Defense. The court read a provision in the Consolidated Appropriations Act of 2019, a provision that appropriated funds to the Department of Homeland Security and appropriated a specific amount of funds for the purpose of building border barriers in the Rio Grande Valley and concluded that that provision, appropriating funds for that purpose to DHS, precludes the Department of Defense from relying on its own statutory authorities to undertake military construction projects using its own appropriated funds in an earlier statute, an earlier appropriations statute enacted several months before the Consolidated Appropriations Act of 2019. That was a misunderstanding of the language of the CAA and it was not, it does not form a basis for the permanent injunction that the district court here entered. The court should not have taken what it understood to be essentially legislative history, the back and forth between the executive and Congress surrounding both before and after the enactment of the CAA, as a basis for concluding that there should be some retrospective change in the appropriation for military construction to the Department of Defense in an earlier statute. Nothing in the text of the CAA supports that and the case law is clear in cases such as Salazar and Lincoln against Vigil that legislative history is not a The plaintiffs make an alternative argument attacking the declaration of a national emergency, but the district court rightly did not rely on any argument about the declaration of an emergency by the president, nor could it have. Again, multiple circuits have held, the Third Circuit, Amir Azmi, and this court in a published opinion in Sotomar that the political question doctrine precludes review by a federal court of the president's declaration of a national emergency. And indeed, the National Emergencies Act reserves to Congress the authority to oversee the president's declaration of a national emergency to take action to reverse it, which Congress has twice attempted to do, but has not managed to pass the joint resolution required with a veto majority to override the president's veto. That statutory structure is intended to ensure that Congress has the authority and the federal courts do not entrench the rights reserved to the political branches. Finally, the plaintiffs make another alternative argument, although they do so only in a few pages in their principle brief, about the terms of Section 2808. I'd be happy to answer any questions the court might have about Section 2808, but I want to emphasize that the district court correctly did not conclude that the military construction projects that the Department of Defense has undertaken here were outside the scope of the statutory authority granted to DOD for military construction, the use of its military construction. If the court has no further questions, I'll reserve the remainder of my time for rebuttal and to address the plaintiff's arguments on cross-agenda. Thank you, Cam. Thank you. Mr. McDowell. Thank you, Chief JoJo, and may it please the court. My name is Ephraim McDowell on behalf of Plaintiffs El Paso County and the Border Network for Human Rights. In my presentation today, I'd like to make the following three points. First, plaintiffs have Article III standings based on economic and organizational injuries. Second, the government's attempt to expand the zone of interest test beyond its settled limits is waived, and we satisfy that test in any event. And third, the government's border wall expenditures in this case violate the Consolidated Appropriations Act because when Congress considers and rejects a I'll start with why El Paso County can sue. And my counsel on the other side did not mention our principal argument for standing here, which is the loss of the Fort Bliss project in El Paso County. The Fort Bliss project was scheduled to be begun in January 2020 in El Paso County, but it was canceled by DOD in order to build the border wall, in order to pay for the border wall. And that Fort Bliss project would have immediately and necessarily benefited El Paso County and its tax revenue base because it would have been a $20 million construction project, and that would have necessarily meant that there were many, many transactions involved with that project that could have been taxed by El Paso County. It says that gives you standing. I mean, that would seem like every time a military decision about a military base was made that affected the surrounding area that those people would have a right to sue. Do you have any case law on that? So we have two cases that I point your honor to, both from the Ninth Circuit. One is the city of Oakland case, which involved a situation where the federal government closed a medical marijuana dispensary in the city of Oakland, and the court found that the city of Oakland had standing to challenge that closure because of the tax revenues that the city lost because of that closure. And the same logic applies here, because El Paso County would have generated tax revenues from the Fort Bliss project, and the cancellation of that project means that El Paso lost those corresponding tax revenues. The other case I would point your honors to is the city of Sausalito case, also from the Ninth Circuit. And in that case, the court held that the city of Sausalito had standing to challenge the construction of a nearby military base that was not in the city, but near the city, because it would lead to economic harm from that nearby construction. And the same logic again applies here with respect to the construction that's being carried out just 15 miles from the downtown El Paso area, which also the government's counsel did not mention. That goes to the cross appeal, the Section 284 construction, but it's another way in which El Paso County is suffering economic harm. But I'd like to point to the Fort Bliss injury in particular because it's difficult to imagine what plaintiff would be better situated to sue to challenge an unlawful executive expenditure than a party who loses the benefit of the unlawfully spent funds. And that's precisely the position that El Paso County is in here. And if someone in this position can't sue, it's difficult to see what sort of plaintiff would be able to challenge an unlawful executive expenditure. And that would mean that any president could spend any amount of money on any project that he or she wanted, even if Congress had considered and rejected precisely that project. Can you point us to the record that shows specifically what entities would have been hired from El Paso and what taxes would have been due? Because I'm trying to understand what taxes a state can charge the federal government, et cetera, because I know there are tax exemptions and so on and so forth. As well, the Fort Bliss construction did not have to use El Paso people and could have brought people from, you know, Albuquerque if they wanted or anywhere they wanted. So I'm just trying to understand what specifics can I look at on that? Sure. So I would point your honor to pages 925 and 926 of the record. That is the declaration of Mr. Sam Diego, who's a top economic official in the county who oversees the county budgetary and tax revenue commission. And what Mr. Sam Diego says is that the lost Fort Bliss project will harm the county budget. It does. And we don't we think that's sufficient at the summary judgment stage for two reasons. The first is that it's consistent with basic laws of economics, and this court has relied on basic laws of economics and finding standing in any of number of any number of cases. And I don't think that there's any requirement. I haven't. I'm not aware of any requirement that plaintiffs submit data or kind of numerical or empirical evidence showing how basic laws of economics would work in any particular case. And the way that it would have worked here is the following. DOD would have paid $20 million to contractors to do the Fort Bliss project. Those contractors would have obviously El Paso could have taxed the contractors sales of their services to the government. But more importantly, they could have also taxed the contractors purchases of supplies as well as labor that were necessary for the project. That's just the tip of the iceberg, because even if the contractors like Judge Haynes you mentioned came from outside of El Paso, they would have lived and worked in the community. And that meant that would mean that they would stay in hotels, eat in restaurants and make any other number of transactions in El Paso County, all of which could have been packed by the county. And the loss of those tax revenues is is an Article three injury. In fact, they could have stayed across. I'm sorry. They could have stayed across the border in New Mexico, too. El Paso is 15 miles from this event that you were talking about earlier, the border wall. It's also 15 less than 15 miles from Mexico and not very far from New Mexico. So, I mean, assuming that El Paso County is going to get the benefit of this, I'm just wondering about that at a preliminary I mean, at a permanent injunction stage when you have to have full proof and not just allegations. I think the allegations might be enough at the beginning. How is this proof? It's not just allegations. It's in a declaration. It's in. I understand that. But how is it proof? If I just say I'm going to lose money if you do this to me, I'm not sure that's proof of anything. Well, it's proof when it comports with basic laws of economics. And we're talking about the loss of a specific construction project. The government is relying on generalized grievance cases, cases where states were challenging federal government action that basically affected all states and citizens equally. This is very different because we're talking about the loss of a specific construction project worth a specific amount of money in a specific county. And basic laws of economics lead to the conclusion that the loss of that construction project would lead to economic harm for El Paso County. And we don't need to show that it's a huge amount. We just need to show that it's some economic injury. And we can do that here based on the declaration and based on basic laws of economics. It would be another thing. Would they benefit at all from the construction of these various aspects of the wall by the same token, that they would hire people that would come from El Paso or travel to El Paso or whatnot because it's a big city in this general area? Or does that not matter? It doesn't matter, Your Honor, for the following reason. In Texas v. United States, this court made very clear that Article III standing is not an accounting exercise. So you don't look to whether there are some offsetting benefits or costs that could alter the plaintiff's injury. What matters is whether the plaintiff is injured by the challenged government action. And here, El Paso County is injured by the challenged government action because the loss of a specific $20 million construction project in a specific county causes concrete and particularized injury to that county. Again, we don't need to show exactly how much in tax revenues. We don't need to show it would be a huge hit to the El Paso County tax revenue base. We just need to show it's concrete and particularized. Going back to the standing issue, let's assume that Congress decided to close Fort Bliss. Would El Paso County have standing to contest that decision? Yes, Your Honor. I believe it would as long as it submitted evidence, which I'm sure it could do. Surely there's been litigation over decisions to close bases. Did you look at any of those cases? Your Honor, first of all, I'm not aware of any cases directly resolving that issue. I do know that in the Dalton v. Specter case, which is discussed in the briefing on a different issue, that did involve the closure of military bases. And there was no question in that case about Article III standing. There were other questions about whether presidential action was reviewable. But it was not an Article III standing question because I think it's quite clear that we know that municipalities can sue in certain cases when they can show direct economic injury. And a municipality can show that sort of direct economic injury when it loses an important part of its economy, which here would be the Fort Bliss, under your hypothetical, would be the Fort Bliss base, which has huge economic impacts for the county. As for... Okay, I'm looking at the record site you gave us. And he talks about the importance of Fort Bliss, and I don't think anybody's denying the importance of Fort Bliss. But what it says about the money for military construction that's going to be reprogrammed, it says, this announcement creates the imminent prospect of economic harm to El Paso County. I don't... That doesn't seem particularly specific to me. Your Honor, there are, again, two points about that. I take the point that we don't have data or anything or empirical evidence. But again, when someone is making a statement in a declaration, and again, this isn't just anybody, this is a top county economic official. When someone in that position makes a statement about the impact it would have on El Paso, and it comports with basic laws of economics, then that party has standing. And just to give a concrete example, why else would members of Congress routinely lobby for military bases or military construction projects in their communities? It's because those military construction projects have significant benefits for those communities and for those communities' governments. And that's exactly the basic law of economics that we're relying on here. And it would be one thing if the government had come forward with its own laws of economics would not work as they normally would in this particular situation. I grant you that in that case, we might have had to come forward with some more data. But the government never came forward with that sort of evidence. And in that situation, I think a declaration from the county official, enough. If I may turn to our other plaintiff here, which is the Border Network for Human Rights, BNHR. BNHR has standing based on this court's binding precedent in OCA Greater Houston. That's a case we cite on page 27 of our opening brief. In OCA Greater Houston, this court held that an immigrant rights organization had standing to challenge a Texas voting law that adversely affected the immigrant community because the organization had to divert resources toward educating its members and counseling its members about the effect of that new Texas voting law. And the same logic applies here. BNHR is an immigrant rights organization and it has two principal missions. First is counseling and supporting the local immigrant community in West Texas in southern New Mexico. And second is proactively advocating for immigration policy reform. Here, after the proclamation was issued by the president and the wall construction in southern New Mexico where many BNHR members lived was announced, the organization diverted resources towards counseling its members about the effects of those new policies, how to navigate those effects on their daily lives. And those were resources that BNHR would have otherwise spent on proactively advocating for immigration policy reform. And that diversion of resources is precisely the sort of injury that this court found sufficient in cases like OCA Greater Houston and Scott as well, which we also cite. So we think that OCA Greater Houston essentially resolves the standing issue with respect to BNHR. My counsel on the other side noted that BNHR is not affected by any of the construction or its declaration doesn't speak to the construction. That's simply incorrect. On pages 940 and 941 of the record, BNHR's executive director explains that the members of the organization who live in southern New Mexico are directly affected and directly harmed by the construction that is happening in southern New Mexico. This is construction that again is happening just 15 miles from downtown El Paso where many of these individuals live. And as a result of that construction, BNHR has poured resources into helping its members navigate the logistical and practical effects of that construction. And as the declaration explains, those are resources that would have otherwise been spent on advocating for proactive immigration policy reform. On page 941, I just quote the executive director. He says, we have spent and will continue to spend approximately 70 to 80% of the organization's time and resources helping our members deal with the harmful impacts of the construction. And again, when an organization has two missions and it has to divert all of its resources effectively to only one of those missions, that suffices for organizational standing. If I may address the government's zone of interest argument, which I suspect the government may bring up in rebuttal, that argument is waived because the government did not make it below. The government did not argue below that we fell outside the zone of interest of the Consolidated Appropriations Act provisions that were relying on this in this case. And the district court held on page 2120 of the record that the government had waived its CAA-based zone of interest argument. So this court should, and even on page 20 of the government's own response brief, the government admits that it didn't make its current zone of interest argument in the district court. So that argument is waived, and this court should follow its general practice of not reaching waived arguments. But even if it weren't waived, even setting the waiver aside, we satisfy the zone of interest test for the relevant Consolidated Appropriations Act provisions in this case. It's important to bear in mind just how generous the zone of interest test is. It's not meant to be demanding. The plaintiff doesn't need to show that the relevant statute was intended to benefit him. He just needs to show that he falls generally within the zone of interest of that statutory provision. And here, the relevant provisions that we're relying on are budgetary provisions that principally benefit Congress and its ability to constrain the executive branch's use of appropriated funds. Here, El Paso County is asserting its own budgetary interests in avoiding the loss of the $20 million in appropriated for bliss funds and the economic harm that would flow from the nearby wall construction. So El Paso's budgetary interests are in the same class interest that these relevant provisions protect. In fact, this is the last point on zone of interest. Judge Smith in the Sierra Club case, one of the Sierra Club cases in the Ninth Circuit, where the Ninth Circuit has now ruled in favor of those plaintiffs twice, Judge Smith was one of the dissenting judges in those cases, and he said that these budgetary statutory provisions, like the ones that are at issue here, protect budgetary and economic interests, even though in his view, he didn't think that they protected environmental. Here, we are asserting the very same budgetary and economic interests that Judge Smith was referring to. So we would satisfy the zone of interest test even under the Ninth Circuit's dissent view. On the questions about just justiciability, Your Honors, I turn to the Mayor and our principal submission on the merits is that the government's border wall expenditures violate the consolidated appropriations act and thus the appropriations clause. And this argument boils down to the following four points. When Congress considers and rejects the presidential budget request, the executive branch cannot disregard Congress's decision. And that point is borne out in the following two ways. First, the longstanding budgetary principle that when Congress appropriates a specific sum of money for a specific project, the executive branch can't rely on more general appropriations to spend more money on that same project. And second, that principle is embodied in the consolidated appropriations acts text and specifically Section 739 of the CIA, which is that page of the funding for projects that the president proposed and Congress has rejected. And I'll call that the proposed projects bar. And if the government is simply incorrect that we're simply relying on legislative history, the specific versus general canon is an actual canon of construction, and Section 739 is in the text of the statute itself. So to start with the specific versus the general under a longstanding federal appropriations law, when Congress appropriates a specific amount of money for a specific project, the executive branch is precluded from relying on more general appropriations to spend more money on that same project. That principle is designed to protect Congress's power of the purse by preventing the executive branch, like in this case, from creatively circumventing considered congressional appropriations. The other and that's reinforced by Section 739 and Section 739 as relevant. That's the proposed projects bar that I was mentioning earlier. It reads that, quote, none of the funds made available in this or any other appropriations act may be used to increase funding for a project as proposed in the president's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriations act. Here, the government's border wall expenditures violate both the consolidated appropriations act proposed projects bar and the specific versus general principle. The president proposed or asked for $6 billion for the border wall project. Instead of accepting the president's request, Congress appropriated 1.375 billion for the border wall project. Given that decision, the executive branch is precluded from what it's doing now, which is relying on more general statutory provisions for military construction and counter drug support to spend more money, an additional $6 billion on the same border wall project that Congress considered and rejected in the CAA. The government's main counter argument to all of this has been that Section 739's proposed projects bar and the specific versus general principle only apply to projects that are carried out by a single agency. They don't apply to projects that are carried out by multiple agencies. So what the government says is because the president asked for money for DHS to build the border wall initially, and then now DOD is building the border wall, these principles don't apply. That's the government's argument. But that argument is factually flawed and legally flawed. It's factually flawed because the president did request money for DOD specifically to build the border wall. And Congress rejected that DOD specific border wall funding request. So the same agency, DOD, has been involved in both the presidential budget request and the border wall construction itself. And that should be forbidden even under the government's own understanding of the word project in Section 739's proposed projects bar. We set forth that argument in detail on page 42 of our opening brief, and the government hasn't responded to that argument at all. The second point is that even if the government's argument were not factually flawed, even if the president hadn't actually requested money for DOD itself, the government's argument would be legally flawed because neither the specific versus general canon nor the proposed projects bar apply only to projects involving a single agency. They also apply to projects involving multiple agencies. After all, Congress knows that the appropriations process plays out across the entire executive branch. And Congress knows that multiple agencies often have similar missions and similar statutory authorities. Think about not only DOD and DHS in this case, but also agencies like the Department of Energy and the Environmental Protection Agency. These are agencies with similar missions and similar authorities. So when Congress specifically appropriates an amount for a specific project, that's all that Congress intends that project to receive, no matter the agency and no matter the source. And when Congress uses the word project in Section 739's proposed projects bar, it includes projects that involve multiple agencies, not just projects that involve single agencies. If the government view here were correct, it would mean that multiple agencies could always work together to circumvent considered congressional appropriations judge, just like DOD and DHS did in this case. Unless there are questions about the consolidated appropriation fact argument, Your Honors, I could move on to our alternative arguments for affirmance. Those are the National Emergencies Act and then the text of Section 2808. So the National Emergencies Act argument boils down, and just to be very clear, if we're correct about the National Emergencies Act argument, then necessarily the Section 2808 expenditures would be enjoined because those expenditures are, they rely on the proclamation, the President's National Emergency Proclamation as a precondition. So if the proclamation is invalid, then those expenditures are invalid as well. And in our view, a valid National Emergency Declaration must address an unforeseen circumstance that Congress did not have time to consider itself. And the corollary to that rule is that when a National Emergency Declaration addresses the very same problem at Congress, that National Emergency Declaration exceeds the President's statutory authority. The sound is cutting out. Can you hear me? I want to speak up a bit. Sorry, can you hear me? Yeah. Okay. So to start with, so our view of the NEA is based on both the statutory text and the statutory history. To start with the text, the text uses the word emergency and the ordinary meaning of immediate action. That definition precludes longstanding problems. And the act's history shows that the NEA was designed to contract, not expand, presidential emergency powers. Before the NEA, presidents had unfettered discretion to declare emergencies whenever they wanted. And through the NEA, Congress sought to change that status quo by imposing some limits on presidential emergency authority. Now, applying those principles here, it's clear that this emergency declaration violates the NEA. Congress considered the very same issue that this proclamation addresses. The proclamation addresses, by its terms, it says it's addressing the problem of unlawful immigration across the southern border. But Congress has considered that problem, and it considered it directly in the Consolidated Appropriations Act, and we know that for three reasons. First, the Consolidated Appropriations Act, it's well known from the legislative record that that was the principal problem that led to the government shutdown, the problem of unlawful immigration across the southern border. And Congress rejected the president's proposed solution to that problem. Second, there could have been no intervening circumstances between Congress's consideration of the relevant problem and the president's emergency declaration because the president signed the Consolidated Appropriations Act on the very same day that he issued the national emergency declaration. So there couldn't have been any unforeseen or intervening circumstances. And third, the text of the proclamation itself doesn't even purport to be addressing an unforeseen circumstance that Congress didn't have time to consider. To the contrary, the text says that the problem of unlawful immigration across the southern border is, quote, longstanding. So whatever the limits of a president's authority under the National Emergencies Act, this declaration has to exceed those limits because we know that Congress was viewing the statute as a safety valve for times of crisis, not as a political tool for the president to use to circumvent a resistant Congress. The government argued in its opening argument that this presents a political question, but with respect, that's incorrect under Supreme Court precedent like Japan Wailing and Zivotofsky, both of which hold that purely legal questions of statutory interpretation do not present political questions, even if they involve significant political implications. And here we're simply asking the court to interpret the text history of the NEA and hold that there has to be some limit on the president's statutory authority. We don't think that the court needs to evaluate whether the conditions on the ground justify an emergency declaration or whether the border wall is good policy. Those might present political questions. But here we're simply arguing based on the text and the history that there has to be some judicial backstop to when the president can invoke the NEA. And I think it's helpful in this case to understand an evolving nature, the evolving nature of the government's interpretation of the NEA in this case. In the district court, the government's interpretation of statute was that the president could declare an emergency whenever he wanted. There were no limits on that authority. And in response, we argue that that would pose a serious question under the non-delegation doctrine because of the lack of the intelligible principle in that statute. But here the government, as I read the government's brief on page 27 of its response brief, the government now seems to be arguing that the word emergency itself supplies an intelligible principle. But the word emergency can supply an intelligible principle only if it's read in accordance with the ordinary meaning of an unforeseen circumstance requiring immediate action. But if it's read in accordance with its ordinary meaning, then the president's declaration in this case simply exceeds his statutory authority and it's unlawful. So I think the government has essentially found itself behind. If the government is arguing that there's no limit to the president's emergency power, then that would raise a non-delegation question and require the court to read the statute narrowly under the constitutional avoidance canon. Or the government is arguing that emergency actually needs to be read in accordance with its ordinary meaning, in which case this declaration plainly exceeds the president's NEA authority. So either way, I think at the end of the day, this has to be unlawful. Our other argument for affirmance, and just to address it very quickly, this is the argument that the plain text of Section 2808, the military construction provision, does not allow DOD to spend money on the border wall under that provision. That provision says that military construction is construction carried out with respect to a base, camp, post, station, yard, center, or other activity under the jurisdiction of the secretary of a military department. And we set forth that text on page 57 of our brief. The government's argument has been that the southern border, where the border wall is being carried out, is an activity under the jurisdiction of the secretary of the military department. But the southern border is an international boundary line. It's not an activity. And that's particularly true because activity has to be read in accordance with the preceding terms in the list, base, camp, post, station, yard, and center, all of which are discrete military sites for traditional military activities. And the border wall and the southern border are nothing like those other discrete military sites. And so we know that Congress did not intend this provision to cover this particular construction. And even if there were some ambiguity about that, that ambiguity would cut in our favor because when Congress assigns major questions of economic and political significance to administrative agencies, it does so clearly. It speaks clearly in the statutory text. And here, this is clearly a decision of major economic and political significance, spending $3.6 billion on the border wall. And at the very least, Section 2808's language is not sufficiently clear to justify a decision of that magnitude. Unless there are further questions, we ask this court to affirm the district court's injunction and to reverse his decision not to grant an injunction as to the Section 284 construction. Thank you. Thank you, Mr. McDowell. Mr. Barron, rebuttal. Thank you, Your Honor. Just a few notes on rebuttal. First of all, I'd like to address the argument that plaintiffs have made about the $20 million appropriated for the Defense Access Roads Project around Fort Bliss. Notably, nothing in the record, nothing in the declarations that the plaintiffs submitted addresses that project or the effect of those, the loss of those, the funds that would be related to that project. And the reason for that is because their declarations all predated the decision by the Department of Defense concerning what projects would be canceled in order to provide 2808 military construction funds for these projects. They never supplemented their declarations to support their standing with anything specific once that $20 million Defense Access Roads Project was identified. What about the argument that you did not rebut Samaniego's declaration about any change in Fort Bliss affecting El Paso? Judge Haynes, we did not have to submit additional facts because the plaintiffs have the burden of demonstrating that they have standing. It is not the burden of the defendants to rebut standing or to introduce counter evidence. Here, as I was just explaining, I think the Samaniego declaration does not address anything specific about 2808 construction. It has only very general, conclusory assertions about the possible loss of revenue based on There is nothing in there, even about this $20 million Defense Access Roads Project. I'd like to also make another point, though, about the Defense Access Roads Project, which was appropriated by Congress but never authorized. Under appropriations law, a project cannot, funds cannot be spent unless they are both appropriated and authorized to be spent by Congress. Here, there was no authorization, and still has not been, for that particular Defense Access Roads Project at Fort Bliss. It was the subject of a general appropriation for military construction, and Congress directed the DOD to identify the projects it would undertake. DOD identified the Fort Bliss Defense Access Roads Project. You say it's missing here? You say the authorization is missing, not the appropriation? That's right, Judge Dennis. The funds were appropriated but not authorized. What that tells us is that we don't have a timeline for when that project could have actually been undertaken, what the contracts would have looked like, because DOD never entered into any contracts to undertake the Defense Access Roads Project. All of that is speculative. It cannot support the plaintiff's standing. But even if it could support the plaintiff's standing, it would only support standing for a much narrower injunction. An injunction concerning that $20 million, and the district court here went much further. It entered a nationwide injunction against all Section 2808 military construction projects. What's your best case for no nationwide injunction, given kind of where we are in that world? Well, Judge Haynes, I think we cited, for example, to the DHS against New York State decision by the Supreme Court in the concurring opinion there that lays out all the very serious consequences of nationwide, or what the opinion there called universal injunctions. We think that's a good starting point for recognizing that the Supreme Court is aware of these concerns. But even apart from those more general concerns about nationwide injunctions, I want to bring this discussion back to these particular claims. Standing is not dispensed in gropes, as the Supreme Court has said in Gill and elsewhere. Each claim and each remedy must be supported by particular facts demonstrating the plaintiff's standing. And that's why the claim about the $20 million Defense Access Roads Project at Fort Bliss could at most support only a narrower injunction, not the nationwide injunction entered here. I want to also address plaintiff's argument that this court's decision in OCA of Greater Houston supports their claim, the claim of BNHR. In that case, the policy that was challenged had to do with restrictions on interpreters in the voting. And what OCA showed and what the record in that case demonstrated was very specific evidence about how OCA had to spend more of its money, resources, and staff time on educating voters about how to deal with that particular policy. What's lacking in this case is any record evidence at all about how any 2808 construction project or even, indeed, any construction project at all, even under Section 284, which is the subject of the cross-appeal, how any construction actually affects the mission of BNHR. The plaintiff's declaration includes allegations about noise and traffic, but they don't link. First of all, they're not claiming any representative standing, representational standing. They're not claiming standing on the basis of their members' injuries, only on the basis of the organization's interests. And they haven't identified why any increased noise and traffic, which, again, would be due only to Section 284 construction in New Mexico, about 15 miles away from El Paso, which is not the subject of this injunction. They've not identified why any increased noise or traffic could be related in any way to the mission of BNHR. That's what's lacking here, in addition to the failure to provide specific allegations, specific evidence, I should say, of the injury to plaintiffs, and the traceability and redressability of that injury. And that redressability concern goes to the specific injunction that the district court entered, which goes well beyond any claim of injury by these plaintiffs and addresses issues that were not addressed in the record. Happy to address the zone of interest if the court has any questions. I will point out only that the district court erroneously concluded that the plaintiffs here didn't have to satisfy any zone of interest for any claim. This court can review that if it needs to reach the merits, which— What is your response to the waiver argument? Well, Your Honor, because the district court did pass on the question, it held that there zone of interest test does not apply to the equitable claims that the plaintiffs have brought, presumably in addition to their APA claims, where it indisputably does apply. We think that that's adequate. Now, to be sure, we did not specifically address the CAA zone of interest in the district court initially. But we have done so, and we've demonstrated why the district court's holding was wrong. We think that's sufficient. I'll also say that the idea that an equitable claim can be broader than the statutory claim under the APA is at odds with the Supreme Court's holding in Hernandez v. Mesa, citing Bluchet, that the courts should be reluctant to find an implied cause of action that goes beyond what Congress authorized in an express cause of action. I'll address the specific against general point very quickly, if I may, and I'll just emphasize that the canons of statutory interpretation that the plaintiffs rely on don't come into play at all unless there's a conflict between the statutes, and there is no conflict here. The statutes that are here demonstrate, as many other statutory schemes do, merely that there are at best overlapping authorities for multiple agencies to undertake efforts in a similar field, that, for example, construction, for example, counter-drug activities with respect to Section 284 in the Cross-Appeal. There is no conflict, and therefore, there is no need to choose a general versus a specific statute. The boilerplate language in Section 739 of the CAA does not implicitly or impliedly repeal any previous statute. No one has ever suggested that it does. It merely restates a well-understood rule of appropriations law, and it uses a term of the art, well-understood in appropriations law, that is, a project program or activity. The district court here deliberately disregarded that term of art's meaning and decided that it could use, instead, a dictionary definition of project, but that is not appropriate in interpreting an appropriations statute. And finally, with respect to plaintiffs' argument about Section 2808, which is actually about Section 2801's definition of a military installation, the government has not asserted that the entire southern border is a single military installation under Section 2101. Instead, as the record demonstrates, each specific project here is a military, if I may finish the point, Your Honor, each specific project site is a military installation, and military construction on each of those installations is appropriate. Thank you. If the Court has no further questions, we urge that you reverse and vacate the decision board. Thank you, Counsel. That will conclude the arguments for this morning. The Court stands in recess until 9 o'clock in the morning. Thank you.